# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

BLAKE GARDENS, LLC,

        Plaintiff,

      v.

STATE OF NEW JERSEY,

        Defendant.

Civil Action No.: 17-cv-03228 (PGS)(LHG)

**Memorandum**

Presently before the Court is Plaintiff, Blake Gardens, LLC's motion for summary judgment (ECF No. 31), and the State of New Jersey's (the State) motion for summary judgment (ECF No. 32), on a facial attack on New Jersey P.L. 2015 c.125 (hereinafter "the 2015 Act"). This case arises from the denial of a construction permit for the development of a residence for individuals with Alzheimer's disease or other dementia disorders in a single-family residential zone (hereinafter "Alzheimer's residence"), in Freehold Township, New Jersey. (Compl., ¶ 20, ECF No. 1). In denying the permit, the Freehold Township zoning officer indicated that pursuant to the 2015 Act, zoning board approval was required to build the Alzheimer's residence. Yet, no such approval was required prior to the enactment of the 2015 Act.

As such, the issue has been narrowed to the following[1]:

> Does the 2015 Act facially violate the Fair Housing Act because it
> requires approval of a use variance from the local zoning board for

---

[1]     Hypothetically, a developer may potentially assemble ten residential lots. Could the developer construct ten Alzheimer's residences without zoning approval? Or similarly, could a developer propose a planned unit development (*see* N.J. Stat. Ann. § 40:55-D-62) which includes Alzheimer's residences without any zoning approval? To the Court, the answers may be substantially different from this case. This decision does not address such hypothetical circumstances.

1

the development of a Alzheimer's residence comprised of 16 bedrooms or 6,062 square feet when a prior statute allowed such development?

For the reasons stated herein, Blake Garden's summary judgment motion is granted, and the State's summary judgment motion is denied. This Court also finds that the 2015 Act violates the Fair Housing Act[2]. The undisputed facts are as follows:

## I.

Plaintiff Blake Gardens ("Blake Gardens") is a limited liability company, duly organized and existing under the laws of the State of New Jersey, whose principal offices are in Mahwah, New Jersey. Blake Gardens develops and builds community residences for people with Alzheimer's disease and other forms of dementia throughout the State. Blake Gardens contends that the dementia homes are indistinguishable from single-family homes from both the outside facade and the inside layout, having large, airy front porches and picket fences. Plaintiff describes the dementia homes' internal layout as being like any other single-family home, which includes individual bedrooms with individual bathrooms, a kitchen, a living room, and a dining room. The residents interact like any traditional family living under one roof together. They eat home-cooked meals, play games, do arts and crafts, watch television, listen to music, garden, and engage in other sundry activities. (ECF 31-2, Ex. J) (Exhibit A).

---

[2] Obviously, planners recognize and abhor ad hoc NIMBY groups established to halt development, and they sarcastically reference NIMBY issues by the use of other acronyms, such as, LULU (locally unwanted loud usage), BANANA (build absolutely nothing anywhere near anything), CAVE (citizens against virtually everything) and NOPE (Nowhere on Planet Earth). *Id.* at 346, n. 57. To the contrary, New Jersey has always promoted local control over zoning issues. *See* N.J. Stat. Ann. §40:55D-2(a) (The purpose of the MLUL is to "[e]ncourage municipal action to guide the appropriate use or development of all lands in [New Jersey] . . . ."); *Township of Franklin v. Hollander*, 338 N.J. Super. 373, 394 (N.J. Super. Ct. App. Div. 2001), *aff'd*, 172 N.J. 147 (2002) (noting that there is "well-recognized local control of land use development" in New Jersey). It is difficult to overlook such a policy.

In 2015, the New Jersey Legislature passed P.L. 2015 c.125, which regulated the development of Alzheimer's residences, and reclassified such residences as health care facilities pursuant to the Health Care Facility Planning Act (N.J. Stat. Ann. § 26:2H-1). The 2015 Act removed these facilities from the definition of Alzheimer's residences, and placed them under the review of the Department of Health (hereinafter "DOH"). This amendment is significant because it changes the zoning of a residence for a person with Alzheimer's disease from conditional approval in a single-family residential zone to one where a use variance is required. N.J. Stat. Ann. § 40:55D-70.

Prior to the 2015 Act, dementia care homes were considered community residences for people with head injuries and were regulated as Class C boarding homes by the Department of Community Affairs ("DCA"). A Class C boarding home is a boarding home that provides meal services, medication monitoring, monitoring of self-administration of medication, and in some cases financial services.

One of the sponsors of the 2015 Act was Bergen County Assemblywoman Valerie Huttle. In proposing the 2015 Act, Assemblywoman Huttle did not consult with the head of the DCA, who had oversight over these residences, nor with the chair of the New Jersey Alzheimer's Disease Study Commission, Lowell Arye. As part of Assemblywoman Huttle's background, she supported a Bergen County community group that sought to prevent the establishment of a Blake Gardens residence for Alzheimer's disease patients. Assemblywoman Huttle, after a legislative committee hearing, issued a press release in which she promoted "the State Department of Health to take over the responsibility of regulating . . . the 34 dementia care group homes in New Jersey"; but there

was nothing within the press release about zoning approvals. There was no industry opponent to the bill[3].

In or around early 2017, Blake Gardens sought to construct a new Alzheimer's residence for people with Alzheimer's disease in a single-family residential zoning district on Hunt Road in the Township of Freehold. To that end, Blake Gardens applied for a building permit from the Township as a home for individuals with head injuries, as the term is defined under the Municipal Land Use Law (MLUL).

Freehold's Director of Zoning and Housing Enforcement, Pasquale Popolizio, requested an overview of the residence from Eric Boe, the President of Blake Gardens, and in a letter dated March 8, 2017, Boe presented the requested overview to Popolizio with a picture of the proposed residence and the description of the home. (ECF No. 31-2, Ex. K). That facility was a 16-bedroom single-story residence comprising 6,062 square feet.

In his letter dated March 8, 2017, Boe stated that the persons to live in the residence "will all have head injuries as that term is defined under New Jersey law and will live together as a family." (ECF No., 31-2, Exh. K).

In a letter dated March 21, 2017, Popolizio rejected Boe's application based on the change in the MLUL which excluded persons with Alzheimer's disease from the definition of persons with a head injury[4]. (ECF No. 31-2, Ex. L). The letter also informed Plaintiff that they could appeal the decision to the Freehold Township Planning Board within 20 days after receipt of the letter. (Ex. G, pp. 460-461). Instead of appealing, Plaintiff filed its Complaint against the State on May 9, 2017 to challenge the 2015 law as a violation of the Fair Housing Act.

---

[3]     The State did not respond to this allegation.
[4]     While the Popolizio letter notes other deficiencies in the application, the parties agree that Blake Gardens can rectify those remaining issues.

In 2011, the New Jersey State Legislature established the New Jersey Alzheimer's Disease Study Commission (the "Commission") after recognizing the need to research, provide services, and address the rate of the population afflicted with Alzheimer's disease and other forms of dementia in New Jersey. (ECF No. 31-2, at 1). The Legislature found that at the time, 150,000 residents of the State were diagnosed with Alzheimer's disease, and that approximately 350,000 residents were directly impacted by the disease. (*Id.* at 2). Therefore, there is a demand within the State of New Jersey for an increase in community-based services (as opposed to nursing homes and institutional facilities) that house and provide services to persons with Alzheimer's disease and other forms of dementia.

In August 2016, the Commission submitted a report (the "Report") to the Governor and the New Jersey Legislature detailing its findings. (ECF No. 31-2, Ex. B). The Commission defined Alzheimer's disease as a "progressive, degenerative, and irreversible neurological disease that develops over a period of years . . . Alzheimer's disease is the most common form of dementia, which is a general term for loss of memory and other cognitive abilities, serious enough to interfere with daily life. It is not a part of the 'normal' aging of the brain." (*Id.* at 12). The Report found that while the disease

> may begin with gradual short-term memory loss, Alzheimer's disease progresses to include a decline in all areas of cognition, language and communication, perception and judgment, and personality. Individuals become unable to converse and be a part of their environment. The individual with [Alzheimer's disease] eventually will be unable to perform the activities of daily living such as ambulation, dressing, feeding, and bathing.

(Report, pp. 12-13). The Report further explained that the process takes years, and the longest period is the "middle stage," which is plagued by safety, health, financial, and personal care issues. (Report, p. 14).

The Report also explained that common issues with individuals with Alzheimer's disease or dementia include wandering, in which a person may leave the home and "wander away," and elopement, where a person believes "something" is wrong and that they must "escape." (*Id.* at 22). The Report explained that to prevent wandering or elopement, individuals need "undivided attention . . . almost 24/7 attention by at least one person." (*Id.*). Further, the Report discussed the impact of Alzheimer's disease on the community, explaining that Alzheimer's disease not only impacts those inflicted with the disease, but also has long term effects on the communities where such people reside. The community impacts include the following:

- Growing challenge for State, county, and local social services to meet the safety and care needs of people with dementia and their family caregivers;
- Increased usage of police, emergency/ambulance, and fire services;
- Increased need for dementia-specific medical care in the community and hospitals;
- Reduced neighborhood participation;
- Growing need for home care aide staff; and
- People with dementia and their families are more at risk for abuse, neglect, and exploitation . . .

More specifically, the Report explained that "[w]hen a wandering or elopement occurs, it is hopefully quickly resolved without police or ambulance involvement; however, if the person goes missing, cannot be redirected, causes a car accident, or becomes assaultive, law enforcement and emergency responders are called upon." (*Id.* at 47).

Finally, the Report recommends that state policy should "[p]romote the infrastructure for enhanced quality of services within the healthcare system to meet the growing number of people

with Alzheimer's disease" and to "[i]mprove public safety and address the safety-related needs of those with Alzheimer's disease living in the community." (*Id.* at 53, 56).

As noted above, the 2015 Act changes the zoning of a residence for a person with Alzheimer's disease from conditional approval in a single-family residential zone to one where a use variance is required. N.J. Stat. Ann. § 40:55D-70. Approval of a use variance requires an affirmative vote of at least five of the seven zoning board members, in the case of a municipal board, or two-thirds of the full authorized membership, in the case of a regional board. *Id.* at § 40:55D-70(d).

A use variance may be granted, "upon finding that: (1) special reasons exist for granting the variance, and (2) the variance 'can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.'" *Kane Properties, LLC v. City of Hoboken*, 423 N.J. Super. 49, 62-63, 30 A. 3d 348, 355-56 (App. Div. 2011), *aff'd as modified sub nom, Kane Properties LLC v. City of Hoboken*, 314 N.J. 199, 68 A. 3d 1274 (2013) (citing N.J. Stat. Ann. § 40:55D-70). Granting a use variance is relatively infrequent and "is the exception not the rule because legislative policy favors land use planning through ordinances not variances." *Id.* (citing *Funeral Home Mgmt. v. Basralian*, 319 N.J.Super. 200, 207, 725 A.2d 64 (App. Div. 1999)). The New Jersey Supreme Court has stated that "[v]ariances to allow new nonconforming uses should be granted only sparingly and with great caution since they tend to impair sound zoning." *Burbridge v. Governing Body of Twp. of Mine Hill*, 117 N.J. 376, 385, 568 A.2d 527, 532 (1990).

## III.

During the course of the litigation, the Court requested that the Borough of Freehold be added as an indispensable party. Freehold declined to participate by setting forth in a brief that it would follow any ruling of the Court, and the Township had no interest to litigate.

Subsequently, the Court requested that the League of Municipalities ("League") join in the case as amicus curiae to address the gravity that any decision would have on other municipalities. Lastly, Alzheimer's New Jersey ("ANJ"), an advocacy group, requested to participate and submitted an amicus curiae brief. Both parties presented significant arguments.

ANJ raises two arguments against the State's attempt to differentiate between persons with Alzheimer's disease and persons with head injuries: (1) The 2016 Commission Report does not provide the State with any justification for treating dementia care homes different than other community residences; and (2) the Report does not help the State show that it could adopt no alternative course of action with less discriminatory impact. (ANJ Br., 16, ECF No. 54).

The League takes no position on the merits or arguments raised by the parties, and instead advocates that local control and review of land use and zoning should be maintained, because local officials have "intimate knowledge of the unique qualities and circumstances of their community" such as parking concerns, traffic patterns, and the capacity and capabilities of police and first responders. (League of Municipalities Br., 6-7, ECF No. 45).

Neither the League nor the ANJ provided any supplemental facts concerning discriminatory practices of municipalities, if any, regarding use variance approvals for development of residences for Alzheimer's disease patients.

A brief review of the prior statute is in order. In the 1970s, the New Jersey State Legislature enacted a statute that provided for community shelters that housed no more than fifteen people, which were permitted in a single-family residential zone subject to approval of the local planning boards. *See Blake Gardens, LLC v. New Jersey*, 309 F. Supp. 3d 240, 244 (D.N.J. 2018). The statute further provided that a planning board could deny a conditional use permit if the community shelter was located within 1,500 feet of any other community residence, or whenever the population of the existing community residences exceeded 50 persons or 0.5% of the municipal population, whichever was greater. *Id.* (citing New Jersey Public Law 1974 c.338)). In 1988, Congress enacted the Fair Housing Amendment Act (FHAA) which extended the Fair Housing Act to protect persons with disabilities. It included persons with either mental or physical disabilities. *Id.* (citing *Association for Advancement of the Mentally Handicapped v. City of Elizabeth*, 876 F. Supp. 614, 618 (D.N.J. 1994)).

In the 1990's, two federal lawsuits successfully challenged the validity of a portion of the New Jersey MLUL as being in violation of the Fair Housing Amendment Act, and as a result, the New Jersey legislature amended the statute to remove the conditional permit language. *See ARC of New Jersey v. New Jersey*, 950 F. Supp. 637 (D.N.J. 1996); *Association for Advancement of the Mentally Handicapped v. City of Elizabeth*, 876 F. Supp. 614 (D.N.J. 1994).

Another related statute, N.J. Stat. Ann. 40:55D-66.2, was enacted to define the phrase "a community residence for persons with head injuries" as well as "a person with a head injury":

> c. "Community residence for persons with head injuries" means a community residential facility licensed pursuant to P.L. 1977, c. 448 (C.30: 11lB-1, et seq.) providing food, shelter and personal guidance under such supervision as required, to not more than 15 persons with head injuries, who require assistance, temporarily or permanently in order to live in the community, and shall include, but be limited to:

group homes, halfway houses, supervised apartment housing arrangements, and hostels. Such a residence shall not be considered a health care facility within the meaning of the "Health Care Facilities Planning Act," P.L.1971, c. 136 (C.26:2H, et al).

\*\*\*

d. "Person with head injury" means a person who has sustained an injury, illness or traumatic changes to the skull, the brain contents or its coverings which results in a temporary or permanent physiobiological decrease of mental, cognitive, behavioral, social or physical functioning which causes partial or total disability.

Under this statute, entities like Blake Gardens could establish homes for persons with Alzheimer's disease or related disorders in residential districts of municipalities pursuant to the MLUL, based on the above exemption for individuals with head injuries. Because these homes were being established as head injury facilities according to the MLUL, the homes were regulated as Class C boarding houses by the Department of Community Affairs. (Def.'s SOF ¶ 21). According to Bernard Raywood, Chief of Bureau of Rooming and Boarding House Standards, a Class C boarding home is a boarding home that provides meal services, medication monitoring, monitoring of self-administration of medication, and in some cases, financial services. (Dep. of Raywood, 37:19-24).

Comparing the 2015 Act to the prior legislation, there are two important provisions which were amended. First, the 2015 Act reclassified dementia care homes as health care facilities pursuant to the Health Care Facility Planning Act, N.J. Stat. Ann. § 26:2H, and placed them under the review of the Department of Health. Under the 2015 Act, a dementia care home is

a facility, whether in single or multiple dwellings, . . . which furnishes food and shelter to four or more persons 18 years of age or older who are unrelated to the operator of the facility, and which provides dietary services, recreational activities, supervision of self-administration of medications, supervision of and assistance in activities of daily living and assistance in obtaining health services to any one or more of such persons, in addition to such facilities,

10

services, activities, and assistance as the Commissioner of Health
may prescribe by regulation that are designed to meet the specific
needs of residents with special needs, including, but not limited to,
persons with Alzheimer's disease and related disorders or other
forms of dementia. A dementia care home shall not include: a
community residence for the developmentally disabled . . . or a
privately-operated establishment licensed pursuant to chapter 11 of
Title 30 of the Revised Statutes.

N.J. Stat. Ann. § 26:2H-150(a).

Second, the 2015 Act amended the definition of a person with a head injury to exclude persons

with Alzheimer's disease.

"Person with head injury" means a person who has sustained an
injury, illness, or traumatic changes to the skull, the brain contents
or its coverings which results in a temporary or permanent
physiobiological decrease of cognitive, behavioral, social, or
physical functioning which causes partial or total disability, but
excluding a person with Alzheimer's disease and related disorders
or other forms of dementia. 2015 Act, Section 10. (emphasis in
original).

*Id.* at § 40:55D-66.2 (emphasis added).

Thus, after the enactment of the 2015 Act, Alzheimer's disease and related dementia

disorders were removed from the definition of "persons with head injury." As such, residences

for individuals with Alzheimer's disease are no longer exempted from the MLUL and are now

subject to zoning approval by local municipalities before these types of residences may be built in

a residential zone.

V.

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party

demonstrates that there is no genuine issue of material fact and the evidence establishes the moving

party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-

23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-

movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ullrich v. United States Secy. of Veterans Affairs*, 457 F. App'x 132, 136 (3d Cir. 2012). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995); *see also Ullrich*, 457 F. App'x at 136 ("[T]he party opposing summary judgment must support each essential element of the opposition with concrete evidence in the record."). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to set forth specific facts showing that there is a genuine issue for trial).

Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in his favor – that no reasonable jury could find for him, summary judgment is appropriate." *Alevras v. Tacopina*, 226 F. App'x 222, 227 (3d Cir. 2007).

The Court has previously narrowed the issue to "whether excluding the development of a dementia care home in a residential area violates the Fair Housing Act," and will analyze the case under the Fair Housing Amendment Act (FHAA). *Blake Gardens, LLC*, 309 F. Supp. 3d at 248.

## VI.

Plaintiff brought the present action, alleging that the State of New Jersey violated the discrimination provisions of the federal Fair Housing Act (FHA) by the enactment of the 2015 Act which excludes Alzheimer's residences from the type of community residences that are statutorily authorized to be developed in a residential zone. (Pl.'s Br. 1). In its motion for summary judgment, Plaintiff principally argues that the 2015 Act is facially discriminatory, and because the State cannot establish that the Act serves a legitimate interest, and that no less discriminatory course of action exists, this Court should grant Plaintiff's motion for summary judgment, and annul the law. (*Id.* at 14-22). In response, the State relies on the Report, arguing that it has a legitimate interest in protecting individuals suffering with Alzheimer's disease, and reclassification of those dementia facilities to health care facilities (like a nursing home) and imposing similar zoning as other health care facilities is a reasonable exercise of its authority.

The FHA prohibits housing discrimination due to a person's disability or handicap. 42 U.S.C § 3604(f)(1). The FHA defines "handicap" as "a physical or mental impairment which substantially limits one or more of such person's major life activities." 42 U.S.C. § 3602(h)(1). Discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling . . . ." 42 U.S.C § 3604(f)(3)(B). The FHA invalidates "any law of a state . . . that purports to require or permit any action that would be a discriminatory housing practice under this subchapter." 42 U.S.C. § 3615.

To establish discrimination under Title VIII of the FHA, a plaintiff must show either

> (1) intentional disparate treatment of the handicapped with regard to housing; or (2) disparate impact alone, without proof of discriminatory intent. *Doe v. City of Butler*, 892 F.2d 315, 323 (3d Cir.1989). A case of disparate treatment may be established against a public entity by demonstrating that a given legislative provision discriminates against the handicapped on its face, i.e. applies different rules to the disabled than are applied to others. *Larkin v. State of Mich. Dept. of Social Services*, 89 F.3d 285, 289 (6th Cir.1996); *see also Association for Advancement of the Mentally Handicapped, Inc. v. City of Elizabeth*, 876 F.Supp. 614, 620 (D.N.J.1994) ("*Elizabeth*"). A plaintiff in this instance need not prove malice or prejudice on the part of the drafters of the statute or ordinance, because the proper focus is on the explicit terms of the legislation. Federal courts have extended to Title VIII the Supreme Court's instruction in the Title VII employment context that "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect." *E.g., Larkin* at 290; *Elizabeth* at 620.

*Arc of New Jersey, Inc. v. State of N.J.*, 950 F. Supp. 637, 643 (D.N.J. 1996).

Where a plaintiff establishes disparate treatment, the burden shifts to the government to justify the disparate treatment. *Id.*; *see also Resident Advisory Bd. v. Rizzo*, 564 F.2d 126, 149 (3d Cir.1977), *cert. denied*, 435 U.S. 908 (1978)). "[A] justification must serve, in theory and practice, a legitimate, bona fide interest of the Title VIII defendant, and the defendant must show that no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Rizzo*, 564 F.2d at 149. "If the defendant introduces evidence that no alternative course of action could be adopted, the burden then shifts back to the plaintiff to demonstrate that other practices are available." *Arc of New Jersey, Inc.*, 950 F. Supp. at 643.

(A)    Intentional Disparate Treatment

To succeed on this claim, Plaintiff must show that there is intentional disparate treatment of individuals with Alzheimer's disease or dementia regarding housing. Plaintiff argues that, based on the 2015 Act, community residences for people with Alzheimer's disease or dementia are

treated differently than community residences for individuals with head injuries, developmental disabilities, or terminal illnesses, as they are a permitted use in residential areas. *See* N.J. Stat. Ann. § 40:55D-66.1. Plaintiff further argues that the 2015 Act treats individuals with Alzheimer's disease or other dementia disorders differently from non-disabled people, as the MLUL allows community shelters for victims of domestic violence, family care homes for the elderly, and adult day care centers in residential neighborhoods. *See id.*; *see also* N.J. Stat. Ann. § 40:55D-66.5b. In response, the State argues that the 2015 Act is not discriminatory, because dementia care facilities were never considered to be community residences for persons with head injuries, and the 2015 Act does not take away a right that was previously possessed by all; instead, it clarifies a specific exception within the MLUL. (ECF No. 31, at 16).

In short, the State argues that the 2015 Act was intended to "close a loophole" that had previously permitted community residences for persons with Alzheimer's disease or related dementia disorders under the "head injury" exception.

This argument, however, lacks merit because 22 such residences have been developed, and it is difficult to accept that the "loophole" existed over such a long period of time without corrective action. The 2015 Act is clear that it does not allow community residences for individuals with Alzheimer's disease or dementia, where it allows similar homes for individuals with head injuries, developmental disabilities, terminal illnesses, and non-disabled persons. Here, the 2015 Act treats individuals with Alzheimer's disease or dementia disparately.

(B)     Legitimate Governmental Interest and No Alternative

Because Plaintiff has shown intentional disparate treatment, the burden shifts to the State to show that it has a legitimate government interest in enacting the 2015 Act. In this regard, the State argues that it has a legitimate interest in protecting a vulnerable segment of its population:

individuals suffering from Alzheimer's disease and dementia. (Def. Br. ECF No. 34, at 12). Here, the State has a legitimate governmental interest in protecting the growing population of people that suffer from Alzheimer's disease or dementia. Still, the State must also show that "no alternative course of action could be adopted that would enable that interest to be served with less discriminatory impact." *Rizzo*, 564 F.2d at 149.

In support of the 2015 Act, the State relies heavily on the 2016 Commission's Report, which was published *after* the State passed the 2015 Act. The State distinguishes Alzheimer's disease and dementia from a head injury, focusing on the degenerative nature of Alzheimer's disease and dementia: gradual short-term memory loss, and then progresses into a decline in "all areas of cognition, language and communication, perception and judgment, and personality," and eventually, patients are unable to perform activities of daily living, including ambulation, dressing, feeding, and bathing. (Report, p. 12-13). The State focuses on various safety concerns that arise in the care of Alzheimer's or dementia patients, including that they may "wander" or attempt to elope and often police or EMS are called to intervene, or that they may leave a stove or oven on and start a house fire. (*Id.* at 43). Further, because of the potential medical issues and fire concerns, individuals are "liable to forget they turned on a stove, which can lead to house fires," and thus zoning review would benefit these individuals, because the homes "should be built in an area where a fire department and other emergency services would have easy and quick access to the facility." (*Id.* at 11).

The State also highlights several incidents of abuse and injury that have occurred at homes for individuals with Alzheimer's or related diseases, including instances where residents were found wandering outside the residences, staff failed to call 911 in a timely manner to secure

16

emergency care for residents in need of medical attention, staff provided wrong medication doses to residents, and residents were attacked by other residents.

The Commission's Report describes the various difficulties these individuals may encounter in their daily lives and as the disease progresses; however, the Report does not conclude that these individuals should not live in community residences in residential zones. Instead, the Report notes that "New Jersey has a 20-plus year commitment to creating a long-term service and supports system that emphasizes [home and community-based services] and relies less on institutionalization . . . ." (Report, p. 43). In addition, Bernard Raywood of the New Jersey Department of Community Affairs and Sue Kelley of the New Jersey Department of Health did not identify any substantive reasons about how those incidents affect location of such homes in a single-family zone. (Dep. of Raywood, ECF 31-2, Ex. H, 25:19 to 29:19; Dep. of Kelley, ECF 31-2, Ex. I, 19:6 to 20:22; 25:10-21).

As indicated below, there are over 20 community residences in New Jersey that house and provide services to persons with Alzheimer's disease and other forms of dementia.

| Community Residence | Address | Zoning District and Municipal Code |
|---|---|---|
| Alcouer at Toms River | 1126 Lakewood Road, Toms River, NJ 08755 | R90, 348-10.12 |
| Beverwyck House of Mercy Heart, LLC | 420 S. Beverwyck Road, Parsippany. NJ 07054 | R2, 430-56 |
| Fox Trail Memory Care Living Chester | 115 U.S. Route 206, Borough of Chester, NJ 07930 | R3, 63-71 |
| Fox Trail Memory Care Living Cresskill | 248 Madison Avenue, Cresskill, NJ 07626 | R10, 275-8 |
| Fox Trail Memory Care Living Hillsdale | 60 Pascock Road, Hillsdale, NJ 07642 | R3, 3 10-48 |
| Fox Trail Memory Care Living Lake | 70 Lake Street, Ramsey, NJ 07446 | R3, 34-2.1 |
| Fox Trail Memory Care Living Mahwah | 699 Wyckoff Avenue, Mahwah, NJ 07430 | R40, 24-31 |
| Fox Trail Memory Care -4A, 30- Living Montville | 55 River Road, Montville, NJ 07045 | R4A, 230-116 |
| Fox Trail Memory Care Living Paramus | 143 Fairview Avenue, Paramus, NJ 07652 | R75, 429-18 |
| Fox Trail Memory Care Living Park Ridge | 103 Kinderkamack, Road, Park Ridge, NJ 07656 | R20, 101-5 |
| Fox Trail Memory Care Princeton | 181 Washington Road, Princeton (West Windsor Township), NJ | R20, 200-173.3 |
| Fox Trail Memory Care Living South River | 69 Burton Avenue, South River, NJ 08882 | R75, 350-14 |
| Fox Trail Memory Care Living Woodcliff Lake | 290 Werimus Road, Woodcliff Lake, NJ 07677 | R225, 3 80-7 |
| Goldenview Living | 1313 Aaron Road, N. Brunswick, NJ 08902 | R6, 205-58 |
| Hillsdale West | 45 Pascack Road, Hillsdale, NJ 07642 | R2, 3 10-48 |
| La Paula At Main, LLC | 244 E. Main Street, Bergenfield, NJ 07621 | R5, 186-36 |
| La Paula Manor Co | 25 South Paula Drive, Bergenfield, NJ 07621 | R5, 186-36 |
| Millennium Memory Care at Matawan | 447 Matawan Avenue, Cliffwood (Aberdeen at Township), NJ 07721 | Rl00, 25-3.1 |
| Millennium Memory Care at Holmdel, LLC | 92 Stilwell Road, Holmdel, NJ 07733 | R40A.30-127 |
| Millennium Memory Care at Monroe | 310 Buckelew Avenue, Monroe, NJ 08831 | R20, 108-6.1 |
| Montclair Manor | 403 Claremont Avenue, Montclair, NJ 07042 | R3, 347-3 |
| Fox Trail Memory Care Living at Green Brook | 205 Rock Avenue, Green Brook, NJ 08812 | MD, 603 |

(Pl.'s Statement of Undisputed Material Facts, ¶ 12, ECF No. 31-3).

In this instance, the Legislature passed the 2015 Act, and the State now justifies it as a necessary clarification of existing law that will benefit and protect individuals with Alzheimer's disease or dementia. Courts have recognized that

> Restrictions predicated on public safety cannot be based on blanket stereotypes about the handicapped, but must be tailored to particularized concerns about individual residents. As the FHAA's legislative history declares, the FHAA "repudiates the use of stereotypes and ignorance, and mandates that persons with handicaps be considered as individuals. Generalized perceptions about disabilities and unfounded speculations about threats to safety are specifically rejected as grounds to justify exclusion." H.R. Rep. No. 100-711 at 18. Any special requirements placed on housing for the handicapped based on concerns for the protection of the disabled themselves or the community must be "individualized . . . to the needs or abilities of particular kinds of developmental disabilities," *Marbrunak, Inc. v. City of Stow, Ohio*, 974 F.2d 43, 47 (6th Cir. 1992), and must have a "necessary correlation to the actual abilities of the persons upon whom it is imposed," *Potomac Group Home Corp. v. Montgomery Cnty.*, 823 F. Supp. 1285, 1300 (D. Md. 1993).

*Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1503-04 (10th Cir. 1995). Moreover, the FHA House Report, which represents "the authoritative source for finding the Legislature's intent . . . [and] represent[s] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation," *Garcia v. United States*, 469 U.S. 70, 76 (1984), states:

> While state and local governments have authority to protect safety and health, and to regulate use of land, that authority has sometimes been used to restrict the ability of individuals with handicaps to live in communities. This has been accomplished by such means as the enactment or imposition of health, safety or land-use requirements on congregate living arrangements among non-related persons with disabilities. Since these requirements are not imposed on families and groups of similar size of other unrelated people, these requirements have the effect of discriminating against persons with disabilities.

> The Committee intends that the prohibition against discrimination against those with handicaps apply to zoning decisions and practices. The Act is intended to prohibit the application of special requirements through land-use regulations, restrictive covenants, and conditional or special use permits that have the effect of

limiting the ability of such individuals to live in the residence of their choice in the community . . .

Another method of making housing unavailable to people with disabilities has been the application or enforcement of otherwise neutral rules and regulations on health, safety and land-use in a manner which discriminates against people with disabilities. Such discrimination often results from false or over-protective assumptions about the needs of handicapped people, as well as unfounded fears of difficulties about the problems that their tenancies may pose. These and similar practices would be prohibited.

H.R. Rep. 100-711, 24, 1988 U.S.C.C.A.N. 2173, 2185.

Thus, while the State highlights the need for more individual care and medical attention for individuals with Alzheimer's disease or dementia, the propensity for Alzheimer's or dementia patients to wander, elope, or become potentially violent, as well as the need for emergency services access to each dementia care home, the State does not explain how each of these needs cannot be met within a community home in a residential zone, with oversight by the DOH. Moreover, the State argues that this is the least restrictive measure, as less restrictive measures were attempted in the past, and were unsuccessful. (ECF No. 32 at 20);[5] but the State does not explain how these measures were unsuccessful. Accordingly, the State has not shown that there is no alternative course of action that could be adopted to serve its interest with a less discriminatory impact.

In fact, the DOH has already set forth regulations of dementia care facilities that address these concerns by requiring that construction plans be submitted to a Health Care Plan Review Unit and comply with the following:

> (1) that newly constructed, renovated, or expanded dementia care homes shall submit plans to the Health Care Plan Review Unit, Division of Codes and Standards, New Jersey Department of Community Affairs, and that these dementia care homes shall conform with the New Jersey Uniform Construction Code, N.J.A.C. 5:23-2 (N.J.A.C. 8:37-2.2);

---

[5] The State cites to specific sections of New Jersey's Administrative Code to demonstrate the previous measures attempted in the past; however, these sections have been repealed, and the State does not provide the repealed version of code sections.

(2) that dementia care homes shall provide residents with dietary services, recreational activities, supervision of self-administration of medications, supervision and assistance of daily living, and assistance in obtaining necessary health care services, (N.J.A.C. 8:37-5.2);

(3) guidelines for discharging residents of these homes shall to facilities that offer a higher level of care, including when the resident is completely dependent in eating and toileting, is unable to self-administer medication, requires medical treatment of pressure sores, exhibits behavior and/or cognitive impairments of such severity to be a danger to self or others, or is bed bound or requires skilled nursing care 24-hours a day, seven days a week (N.J.A.C. 8:37-4.2);

(4) that each home shall have at least two staff persons on duty at all times who are awake and able to provide assistance to residents, and such stall shall complete a home health aide course (75 hours) that is given by a home health agency approved by the State Board of Nursing, and a shall complete five-day course given by a registered nurse or other healthcare professional that includes an orientation to the facility and specific training regarding Alzheimer's disease (N.J.A.C. 8:37-5.3-.4); and

(5) building safety requirements, including that the entrance to the front yard shall be controlled with a non-scalable fence of at least four feet and a gate, the gate will have self-closing and self-latching hardware and be equipped with a doorbell or intercom that controls access into the building, Exterior doors shall be locked at all times and access by the residents and visitors will only be permitted with the assistance of a staff member, the gate or main entrance of the residence shall be monitored by a closed circuit monitor and windows and doors will be equipped with audible alarms that will ring if a door or window is opened, (N.J.A.C. 8:37-7.10).

Other community homes, such as homes for the developmentally disabled, community residences for the terminally ill, community residences for persons with head injuries, and adult family care homes for elderly persons and physically disabled adults, likely require similar services, but are permitted to exist in residential zones without applying for a use variance. In fact, as discussed above, the State has already shown that it can regulate dementia care homes through the regulations passed by the DOH without implementing zoning restrictions on where such homes may be built.

Finally, the State argues that those seeking to establish an Alzheimer's residence may seek a use variance, which would allow zoning review to ensure proper "fencing, fire precautions, and other critical safety related matters." (ECF No. 34, at 12). However, the State has not shown any evidence that emergency services presently do not have adequate access to these community residences in residential neighborhoods, or that existing community care homes have critical safety issues, such that additional zoning review is necessary.

Even more, according to Plaintiff, a use variance would only be granted in exceptional circumstances and is a timely and costly procedure that would result in uncertainty due to potential not-in-my-backyard ("NIMBY") issues. Though the State concedes there may be NIMBY issues, Plaintiff does not provide support apart from the Report, which only mentions NIMBY issues may arise, and does not provide any clear examples of past NIMBY issues. At this time, there are no facts showing that a NIMBY-type issue will arise should a developer seek a use-variance to develop a dementia care home in a residential neighborhood. However, one cannot put on blinders and ignore the fact that obtaining a use variance by approval of super-majority of a zoning board is an obstacle to development. It is evident from a commonsense perspective that opposition will arise in the most densely populated state in the country. *See*, *generally*, Delogu, Merrill & Saucier, Some Model Amendments to Maine (and other states') Land Use Control Legislation, 56 Me. L. Rev. 323, 345-349 (2004). In fact, if Maine foresees NIMBY issues, those problems will likely arise in New Jersey.

Even so, the State has not shown how removing Alzheimer's and dementia from the MLUL, thus disallowing these homes to be built in residential neighborhoods absent a use variance, is the only course of action that would enable the State to protect the interests of individuals with Alzheimer's disease and dementia with no less discriminatory impact. Instead,

the 2015 Act seems to be the exact type of discrimination the House Report warned against, that is, discrimination that results from "over-protective assumptions about the needs of handicapped people, as well as unfounded fears of difficulties about the problems that their tenancies may pose." H.R. REP. 100-711, 24, 1988 U.S.C.C.A.N. 2173, 2185.

## VII.

In summary, the State has a legitimate governmental interest in protecting its vulnerable citizens with Alzheimer's disease and dementia. Nevertheless, the State may not protect these individuals in a way that discriminates against them without justification. The State has not provided any justification for the 2015 Act's facial discrimination against individuals with Alzheimer's disease and dementia. For these reasons, the State's motion for summary judgment is denied, and Plaintiff's motion is granted.

_____
PETER G. SHERIDAN, U.S.D.J.

October 9, 2019

# EXHIBIT A



**CORINTHIAN CONSTRUCTION, INC.**

147 HALIFAX ROAD, MAHWAH, NEW JERSEY 07430-1627
201-529-4660 • FAX 201-529-5685
NJ License #13VH00985200
Registered Builder # 007875
Established: 1983

March 8, 2017

Pasquale Popolizio
Director of Zoning & Housing Enforcement
Township of Freehold, NJ

Dear Mr. Popolizio,

As per your request, I have prepared the following overview of our project:



## 162 Hunt Road, Freehold, NJ
## Community Residence

Corinthian Construction, Inc(Eric & Barbara Boe) proposes to build its twentieth home in NJ, for the care of residents suffering with Alzheimer's disease or other forms of dementia. The persons to live in the residence will all have head injuries as that term is defined under New Jersey law and will live together as a family. They will share meals

and engage in common activities like any other family. The home is a sixteen bedroom, single-story, 6062 sq.ft. residence. Our vision is to provide the highest quality of life and care possible for fifteen residents in a setting that is safe, comfortable, familiar and homelike. Our Residents are protected by both the Federal Fair Housing Act as well as the Americans with Disabilities Act

Corinthian incorporated in 1983 and has predominantly been involved in the design and construction of residential real estate, both new homes and additions. In 1995, Eric Boe, president, joined with the founder of Potomac Group Homes Corporation(Alzheimer's Care) and subsequently built fifteen of their homes. All of their homes are located in residential neighborhoods of NJ as permitted under NJSA 40:55D-66.1. After Potomac discontinued building, Corinthian continued to design, build own and operate four more homes.

The home in Freehold will be owned by a Real Estate Company(Blake Gardens LLC). Upon completion, the Operating Company(Millennium Memory Care at Freehold, LLC) will obtain a License from the NJ Department of Health and commence operating the home upon completion and issuance of a CO.

Please feel free to contact me if you have any questions.

Sincerely,

Digitally signed by Eric N. Boe
DN: cn=Eric N. Boe, o=Corinthian
Construction, inc., ou,
email=ericboe@corinthian-
construction.com, c=US
Date: 2017.03.08 10:12:14 -05'00'

Eric N. Boe
President